OPINION
{¶ 1} Defendant-appellant James Tietge appeals from an order denying his motion for a new trial. Tietge contends that the trial court erred by failing to grant his motion, because he had shown that the State failed to disclose exculpatory evidence, in violation of Brady v. Maryland (1963), 373 U.S. 83, and he also presented additional evidence favorable to him.
 {¶ 2} We conclude that Tietge has failed to establish the existence of exculpatory evidence that the State failed to disclose, and that the other evidence he relies upon was neither newly discovered, nor admissible. Consequently, the judgment of the trial court is Affirmed.
 I {¶ 3} Tietge and his wife, Melissa, who had been married about a year, separated in late August, 2003. Tietge moved out of the marital residence, which he had owned prior to the marriage. Tietge and his wife agreed, in principle, to a dissolution of their marriage, which included a provision that Tietge would leave his wife alone in the house, and that, two weeks after the dissolution papers were signed, she would pack up and move out of the residence. Tietge signed the dissolution papers, but his wife refused to do so until he gave her his oral assurance that he would leave her alone for the two-week period she had to move out.
 {¶ 4} The incident giving rise to this conviction occurred on October 14, 2003. Up until immediately prior to the alleged violent act, the accounts of Tietge and his wife, Melissa, differ only slightly, in that she recalls an earlier discussion they had on telephone that day, which he denies. In any event, it is undisputed that at about 3:00 that afternoon, the mail was delivered to the residence, and Tietge received two registered or certified pieces of mail, as well as one regular piece of mail. Melissa Tietge signed for the registered or certified pieces of mail, on her husband's behalf. Mrs. Tietge was concerned that she might not be able to establish, later, that she had forwarded the mail to her husband, so she sought the advice of the postal authorities. They suggested that she either deliver the pieces of mail to her husband's attorney, or to her husband directly, but that, in either event, she should get a receipt.
 {¶ 5} Mrs. Tietge called her husband, on his cell phone, to discuss the mail. He did not answer, so she left a message on his voice mail. Later that afternoon, he returned her call, and agreed to come to the house to pick up the mail and give her a receipt. A little after 5:00, Tietge arrived. Tietge executed a receipt at the residence, but Mrs. Tietge noted that it did not reflect that the mail was registered (or certified, both of these terms were used in the testimony), and that it was not dated. Tietge was "a little agitated" about this request, but complied. Mrs. Tietge then gave him his mail.
 {¶ 6} There was then some amiable conversation. Tietge showed his wife the badge he had received that day as a new deputy in the Montgomery County Sheriff's Department. He had been a Camden police officer. His wife asked him if he had shown the badge to his father yet, because she knew his father would be proud of him. The conversation then turned to the dissolution papers, and by both accounts, things took a turn for the worse.
 {¶ 7} Both accounts agree that Tietge wanted his wife to go ahead and sign the papers, but his wife wanted him to promise her that he would leave her alone for the two weeks she would then have to pack up and move out. Both accounts agree that this was, at best, a sore subject. According to Tietge, he was on his way out the door at this point when he told her: "Fuck it. I'm not gon- — don't worry about it, the Dissolution papers, they're not gonna be there in the morning. I'm goin' up and I'm filing for divorce. Don't even worry about — I'm tir- — I'm not arguin' with ya' no more. There's gonna be no more discussion about it. I'm just gonna file for divorce." Whereupon Tietge left. By his account, he never approached his wife by nearer than the distance required to exchange the receipt and the mail and give her the badge and retrieve it. He also testified that his wife was in a Lazy Boy chair the entire time he was in the house.
 {¶ 8} Mrs. Tietge described the culmination of the argument about the signing of the dissolution papers as follows:
 {¶ 9} "A. No. Uh . . . James started yellin'; we ended up gettin' into it. He grabbed me, shoved me into the couch.
 {¶ 10} "* * *
 {¶ 11} "Q. All right. And you — you allege that, uh . . . — that your husband grabbed you where?
 {¶ 12} "A. The — my shirt. Just — I had a tee-shirt and a pair of sweats on.
 {¶ 13} "Q. All right. And did what? He did what then?
 {¶ 14} "A. Excuse me?
 {¶ 15} "Q. He grabbed you by the tee-shirt and did what?
 {¶ 16} "A. Uh . . . slung me around a little bit. James, uh . . . yelling, grabbed my — my shirt, slung me around. Tossed me down into the couch. Uh . . . had his forearm just pushing me — pressing me down into the couch, the corner of the couch.
 {¶ 17} "Uh . . . and yelling and cussing and ranting and raving the way he usually does.
 {¶ 18} "* * *
 {¶ 19} "Q. As a result of being forced onto the couch, uh . . . did you suffer any injuries?
 {¶ 20} "A. Uh . . . a busted eye, uh . . .
 {¶ 21} "Q. Sorry?
 {¶ 22} "A. A busted eye.
 {¶ 23} "Q. What do you mean by a busted eye?
 {¶ 24} "A. Uh . . . it had blacked the whole — all the way around from . . .
 {¶ 25} "Q. Do you know . . .
 {¶ 26} "A. . . . here to . . .
 {¶ 27} "Q. . . . that occurred?
 {¶ 28} "A. . . . all the way around.
 {¶ 29} "From his elbow striking. I had scratches across my chest from where he grabbed the shirt. The shirt was stretched out. Uh . . .
 {¶ 30} "Q. Could you describe for us how it is that you came to have a black eye and how you were struck?
 {¶ 31} "A. Well, James had me shoved down with his forearm into the couch, yelling and cussing and having a fit. Uh . . . when he came up, his elbow hit on the eye. And . . .
 {¶ 32} "Q. Did that cause you pain or discomfort?
 {¶ 33} "A. Excuse me?
 {¶ 34} "Q. Did that cause you pain or discomfort to your eye?
 {¶ 35} "A. Absolutely. It was sore. It swelled."
 {¶ 36} Mrs. Tietge did not seek medical treatment, and there is no evidence in the record that her injuries are permanent. She also testified that scratches to her chest, which she attributed to her husband's having grabbed her by the shirt and having slung her around, caused her pain or discomfort.
 {¶ 37} Mrs. Tietge testified that the whole incident, from when her husband came in the door to when he left, was no more than ten minutes in duration. After briefly debating with herself whether to call the police, she did so.
 {¶ 38} Perry Township police detective Paul Hudsonpillar responded. He was dispatched at 6:20 that evening, arrived at 6:31, and left at 7:50. The story Mrs. Tietge told him was consistent with her trial testimony. Hudsonpillar took pictures of her injuries on his digital camera. Prints of these photographs were received in evidence at the trial.
 {¶ 39} Later that evening, Tietge, who had been alerted by a friend that a police car had been seen in front of his house, made contact with Hudsonpillar, made a statement over the phone, and agreed to come in. Tietge gave Hudsonpillar his version of events. When he saw the scratches on one photograph, Tietge asked Hudsonpillar to take a photograph of his fingers, showing that his fingernails were short, with no exposed edge capable of making a scratch. Hudsonpillar obliged. These photographs were received in evidence as a defense exhibit.
 {¶ 40} Mrs. Tietge had been requested to come see Hudsonpillar the following day, for further investigation and further photographs. She cancelled the appointment. She testified that she wanted assurance that her husband would not be present, and was only willing to trust the assurance of Hudsonpillar, who was not able to talk to her. She had her daughter take pictures of her face on October 18, 2003, four days after the incident. The State offered these in evidence at trial, but the trial court sustained Tietge's objection and refused to admit them.
 {¶ 41} Tietge was arrested and charged with Domestic Violence. Following a bench trial, he was found guilty. A judgment of conviction was entered, and Tietge was sentenced accordingly. His direct appeal from that conviction and sentence is the subject of Case No. 20766. Following his conviction and sentence, Tietge moved for a new trial, pursuant to Crim. R. 33. His motion was denied. This appeal is from the order denying his motion for a new trial.
 II {¶ 42} Tietge's sole assignment of error is as follows:
 {¶ 43} "THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT-APPELLANT'S MOTION FOR A NEW TRIAL."
 {¶ 44} In support of his motion for a new trial, Tietge relied upon a polygraph examination that he allegedly took and successfully passed, a voice stress analysis indicating no deception on his part, evidence that his wife, the complaining witness, had a criminal record, and evidence that his wife defrauded an individual in connection with her purchase of a motor vehicle three years earlier. On appeal, possibly realizing that the polygraph examination, having been conducted before trial, could not qualify as newly discovered evidence, and that both the polygraph examination and the voice stress analysis are, in any event, inadmissible as evidence, Tietge seems to be relying solely upon the allegation that his wife, the complaining witness against him, had a criminal record, and that the State violated its duties under Brady v. Maryland, supra, by not disclosing this before trial.
 {¶ 45} The sole basis for Tietge's allegation concerning the existence of his wife's criminal history is a statement at the end of an incident report involving a prior dispute between Tietge and his wife, as a result of which the police were dispatched, on September 24, 2003. At the end of that report the following appears: "Mrs. Tietge has three unconfirmed warrants through Pike County, but the pick up radius is not valid." This is supplemented only by Tietge's own affidavit, in support of his motion for a new trial, in which he avers as follows:
 {¶ 46} "5. I have recently discovered that my ex-wife may have been convicted, prior to my trial, of several counts of passing bad checks and that at the time of my trial, there may have been a warrant for her arrest from Pike County, Ohio."
 {¶ 47} As the State notes, we have previously held that in order to establish a violation of Brady v. Maryland, a defendant must show that evidence was withheld from the defendant that is both favorable to the defendant and material to guilt or innocence, and that evidence is material in this sense only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. State v. Coleman, 2005-Ohio-3874. We agree with the State that the submission offered by Tietge in support of his motion for a new trial falls short of establishing a violation ofBrady v. Maryland. Everything he has submitted is laced with speculation. His wife "may" have been convicted of passing bad checks, and there "may" have been a warrant for her arrest. The incident report refers to "unconfirmed" warrants. Even if there were warrants, their existence would not establish the existence of convictions admissible to impeach her testimony under Evid. R. 609.
 {¶ 48} Tietge points out that he has no access to the LEADS system or to BCI, but his ex-wife's criminal convictions in Pike County, if they exist, would be public information,
 {¶ 49} verifiable at the Pike County Clerk of Court's office, if not over the internet. In our view, Tietge's submission fails to establish the existence of a Brady violation.
 {¶ 50} Tietge also submitted a written statement by one Roger Castle to the effect that a "Milisia" Howard[1] purchased a 1996 Ford Taurus from him in 2002, paid $1,000 down, was supposed to pay the balance of the down payment, another $372, within thirty days, only mailed in $300, and never made a single payment. In his affidavit, Tietge references this as follows:
 {¶ 51} "12. I have also recently learned that my ex-wife defrauded a Mr. Roger Castle of an automobile approximately three years ago. See Exhibit `D' attached hereto and made a part hereof. There may be existing felony charges on that case."
 {¶ 52} This, too, seems speculative. Tietge's ex-wife "may" have defrauded Roger Castle; alternatively, she may have been unable to pay this debt. Again, we conclude that this submission falls short of establishing a Brady violation, especially since there is nothing in the record to establish that the State knew, or should have known, about the circumstance involving Roger Castle.
 {¶ 53} Tietge's sole assignment of error is overruled.
 III {¶ 54} Tietge's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
Wolff and Donovan, JJ., concur.
[1] Although Tietge's ex-wife, the complaining witness, was identified as "Melissa" throughout the trial transcript, she is identified as "Milisia" in the September 24, 2003 incident report.